ELMORA DEVELOPMENT COMPANY, complainant,

*v.*

MORRIS HORWITZ et al., defendants.

[Decided July 25th, 1924.]

**Specific Performance—Agreement to Exchange Property—Numerous Terms to the Contract—Inflated Values on Both Sides—Financial Reverses of Defendant Not Ground for Denying Performance—Concessions on Part of Defendant.**

On final hearing.

*Mr. Charles Jones,* for the complainant.

*Messrs. Stein, Stein & Hannoch,* for the defendants.

BUCHANAN, V. C.

Complainant's bill is for specific performance of a contract, dated April 17th, 1923, between it and defendant for the sale and conveyance by each party to the other of real estate, respectively, owned by each. (Horwitz's wife is also a party defendant, but need not be considered in these conclusions.)

Complainant's property comprises building lots in Elizabeth, to be conveyed unencumbered except by restrictive building covenants. Defendant's property is a building in Newark, comprising a theatre and five stores, all leased to tenants. It was to be conveyed subject to a $70,000 mortgage, covering also an adjoining property of defendant (consisting of a garage and stores), the payment in full of which mortgage was to be assumed by complainant, and subject to the leases (the benefits of which were also to be assigned to complainant).

Agreed (gross) valuations were placed on the respective properties for the purposes of the exchange, complainant's at $63,389.75 and defendant's at $135,000.

Defendant's theatre property and his adjoining garage property were also encumbered by a $10,000 second mortgage, and by mechanics' liens and other building claims amounting to approximately $10,000. Complainant agreed to pay (and did pay) defendant at the signing of the agreement $10,000, to be used in paying off all these building claims and liens, and agreed to pay $10,000 more in cash, at the date fixed for consummation (two months after the date of the agreement, or earlier, at complainant's election), to be used in discharging the $10,000 second mortgage.

Defendant was also indebted to tenants in the sum of $14,100 for advance rents or security deposited against rents accruing; this liability was assumed by complainant. This sum, together with the $20,000 above mentioned and the $70,000 first mortgage, aggregated $104,100, deducting which from the agreed valuation of $135,000, left a balance of $30,900. Setting off this last sum against the agreed valuation of complainant's property, $63,389.75, left a balance due complainant of $32,489.75, for which defendant was to execute and deliver to complainant a purchase-money bond and mortgage, payable in one year, covering the premises to be conveyed by complainant to defendant.

Complainant agreed to "sewer, grade and flag" the streets on which the building lots fronted. This has been done.

Defendant further agreed "that within a reasonable time after the execution of this agreement they will commence the erection and construction of at least ten dwelling-houses" on the building lots to be conveyed to defendant; and complainant agreed to advance to defendant temporary construction loans of $5,500 for each of said houses, to be advanced in specified installments as the building progressed. These loans were to be for six months, and the gross amount was to be added to the $32,489.75 purchase-money bond and mortgage above mentioned. Releases from this mortgage were to be given at certain prices per front foot, and when

one of the houses was to be released, the $3,500 temporary construction loan was also to be repaid.

There was another provision of the agreement, that at the time of the execution thereof, in consideration of the advance payment of $10,000 to pay off the mechanics' liens, defendant should execute to complainant a "security mortgage" in the sum of $10,000, covering defendant's theatre property and also his adjoining garage property (which was worth about $84,000); that at the date of consummation the theatre property should be released from this mortgage, but not the garage property; that the mortgage should "be canceled" as against the garage property when defendant had completed the ten houses and repaid complainant the temporary construction loans and paid the stipulated amount for the releases from the purchase-money mortgage of the lands on which the ten houses were erected (which would mean a total payment to complainant of $61,250, or all but some $6,000 of the total mortgage indebtedness). It was further agreed that if the ten houses should not be erected and completed, and if there should be a foreclosure of the purchase-money mortgage and a deficiency thereafter remaining, the $10,000 mortgage should be collateral security for such deficiency.

There were a number of other provisions in the agreement, which are not material to the present determination.

The agreement was partly carried out on both sides. The $10,000 was advanced by complainant, and was used to pay off the mechanics' liens, and defendant executed and delivered the $10,000 mortgage in return therefor. Complainant "sewered, graded and flagged" the streets in front of the lots, and defendant commenced the construction of the ten houses. The consummation of the agreement did not take place by June 17th, but was extended once or twice, by mutual consent, but, finally, in July, defendant refused to consummate the contract, this determination being caused apparently by defendant finding himself, with the limited resources and credit available to him, unable to complete the construction of the houses even with the help of the tem-

porary construction loans to be advanced by complainant. Complainant's bill was promptly filed.

Complainant's proofs show that it is, and has always been, ready, willing and able to carry out all of the provisions of the contract. Enforcement of the contract is resisted on two grounds—first, that the contract comprises a building contract, which this court cannot and will ·not attempt specifically to enforce; and second, that enforcement would work undue hardship and oppression upon defendant.

It is, at least, doubtful if defendant's first contention be well founded. As is pointed out in a recent opinion of Vice-Chancellor Backes in a somewhat similar case, complainant is not asking this court to compel specific performance of the defendant's promise to build. That is a promise which was to be performed *in futuro,* and no provision in regard to it is necessary in the decree which is the object of complainant's present suit. Moreover, to remove this objection, complainant at the hearing announced that it waived the provisions of the contract relating to the construction of the ten houses, and the giving of the mortgage to cover the $35,000 of construction loan moneys. It would seem that this offer is sufficient to eliminate defendant's first objection.

One of the elements of defendant's claim of undue hardship and oppression is an alleged inadequacy of consideration, an over-valuation of complainant's property to the extent of more than $30,000 (or about one hundred per cent.). Indeed, it is contended that there was an actual misrepresentation in this behalf by one Tannenbaum, alleged to be complainant's agent.

I am unable to find any fraud or misrepresentation attributable to complainant, or relied on by defendant. Tannenbaum was produced as a witness by complainant. He was the broker employed or authorized by defendant to negotiate a sale of his theatre property. I believe from the testimony that he had told defendant that complainant's property was worth the $63,389 asked by complainant. But it does not appear that Tannenbaum was an agent of complainant. All that appears is that he "is to receive a com-

mission" from complainant; it does "not appear that complainant made any such promise before the contract, or that complainant authorized him to negotiate a sale of its lots. Moreover, such a statement—a mere statement of the worth or value of the lots—is not such a representation as defendant was entitled to rely upon, even if made by complainant. *Cf. Mount v. Loizeaux, 86 N. J. Law 511* (at *p. 517*). Still further, as will be seen, it was not in fact relied on by defendant.

Complainant concedes that the valuation of $63,389 on the lots was about $30,000 in excess of their fair value, or the price for which it would have sold them for cash, at the time of the contract, but says that this over-valuation was made to correspond with an equal over-valuation by defendant of his property, and that defendant knew this; that the fair value of defendant's property was only $105,000.

That there was an over-valuation by defendant of his property, and that defendant knew that complainant was over-valuing its lands, I am constrained to believe, in spite of defendant's denial, from the testimony of Mr. Larkey, defendant's own lawyer, and called by defendant as a witness. He says that Horwitz had told him that he would sell his theatre property for $110,000; and, further, that Horwitz had said to him that he knew the complainant's property was being over-valued; that the part that was valued at $100 a foot was worth about $60, and the part that was valued at $75 a foot was worth $45 or $50, but he was satisfied to go through with it on that basis, because he felt he would "make out clear and have the garage property left for him."

I am inclined to believe, however, that there was in fact some inadequacy of consideration. Mr. Larkey's testimony, and the fact that Horwitz said he would sell for $110,000, must be considered in connection with Horwitz, circumstances at the time, to wit, that he had these $10,000 of mechanics' liens and claims against the property which were being pressed; that he had no money with which to meet them; that he had made efforts for some time to raise

money by mortgage or sale; he was in a situation where he had to do the best he could and do it quickly. It would seem from Mr. Larkey's testimony above mentioned that Horowitz believed the price of the lots was inflated only about sixty-six per cent. instead of one hundred per cent., which would be about $22,000 instead of $30,000. Considering that he raised the value of his own property an equal amount, he was figuring that he was getting the equivalent of $113,000 for his poperty, under these circumstances amounting practically to a forced sale.

Admittedly, the annual rentals from his property were $14,100. This would not, however, indicate that $140,000 would be a fair valuation for the premises, for there would be a higher rental basis in the case of theatre property than ordinary property. Mr. Linnett, a disinterested witness, a real estate expert of Newark, places the value of the theatre property at $125,000, exclusive of the seats (for which Horwitz says he paid over $7,000, but the present value of which does not appear).

Mr. Feinswog, complainant's president, testified that he told Horwitz he had had an appraisal made of the theatre property, and that the report placed its value at $105,000, but this appraiser was not called to testify. It appears that complainant sold the property to its treasurer for $105,000, and that the latter sold it to another party, in an exchange, at a valuation of $128.000. (Complainant was, of course, in the business of developing and selling its lots, not operating a theatre building.)

From all the evidence I am inclined to believe that the fair value of defendant's property was about $120,000 to $125,000, as against a fair value of about $35,000 for complainant's property. This would mean an inadequacy of consideration to the extent of about $15,000. I repeat, however, that I am satisfied that there was no fraud or sharp practice on the part of complainant.

Inadequacy of consideration, unless through fraud, or so great as to amount to constructive fraud, is not alone ground for refusal of specific performance, but it will be given con-

sideration and weight, if there be other circumstances tending to make such a decree inequitable.

It is argued by defendant's counsel that there are such additional circumstances in the present case. He points out defendant's age, and his partial physical disability, which are material in connection with the fact that what he was relying on "to come out clear" in the transaction, was the construction and sale of the ten houses within a year, and in the same connection, his financial inability to carry out this project; he has no income except from the theatre and garage property; his daughter has had to give up her employment in order to take care of her father and mother and the household; a judgment of some $30,000 has recently been recovered against him; his brother (or son) for the assistance of whose experience in building he had hoped has left and gone to California; he cannot hope to sell the lots (even disregarding the competition of complainant), because, admittedly, he has to pay for a release of each lot from the lien of the purchase-money mortgage more than the lot could be sold for; and the purchase-money mortgage, which was to be payable in one year from June 17th, 1923, would mature due practically immediately, and defendant would be unable to meet it.

Defendant's situation naturally elicits some sympathy, but I am unable to conclude that it is such as to call for a denial of decree for specific enforcement, at least, in view of complainant's offers to modify the terms of the contract at defendant's option. The main factor in defendant's argument, when it is boiled down, is his financial inability to complete the building program. This, however, is eliminated by complainant's offer to waive that requirement, which eliminates also whatever force the question of his physical infirmity might otherwise have (which, from his appearance in court, did not seem to me so great as to prevent his supervision of building construction). Aside from all this, it is simply a matter of financial reverses, and I have never known that that was a sufficient reason for denying specific enforcement.

The contract has already been partially performed on both sides, which is to my mind an added reason for enforcement. The arguments now made against enforcement were not the reasons for defendant's refusal to complete performance. The evidence shows that the value of the property to be conveyed by complainant to defendant has appreciated since the contract, and in all probability will continue to appreciate. There is a credit due to defendant on the $70,000 building and loan association mortgage of about $7,000.

Complainant offers, as has been said, to waive the contract provision as to the building of the houses and the construction loan addition to the mortgage. It also similarly offers, at defendant's election, to extend the maturity date of the purchase-money bond and mortgage to six months from date of consummation or decree, and to reduce the amounts to be paid for releases of lots to $50 per front foot on Jersey avenue and $40 per front foot on the other streets.

These offers should, of course, be made by amendment to the bill. Complainant may have an order permitting such amendment, and defendant may have ten days after such filing (and service of copy on defendant) to signify its election in respect of the several offers. Final decree will then be made in accordance with the situation as it then exists.

I think the case is one in which costs should not be awarded to either party.